IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. GEORGE BRADFORD HUNT and<br>WALTER W. GAUGER, Relators,<br>and the States of FLORIDA,<br>ILLINOIS, TENNESSEE,<br>NEVADA, MASSACHUSETTS,<br>VIRGINIA, and<br>the DISTRICT OF COLUMBIA,<br><br>    Plaintiffs,<br><br>  v.<br><br>MERCK-MEDCO MANAGED<br>CARE, L.L.C., and<br>MEDCO HEALTH SOLUTIONS, INC.<br><br>    Defendants. | Hon. Clarence C. Newcomer<br><br>Case No. 2:00-cv-737-CN |

**COMPLAINT BY THE COMMONWEALTH OF MASSACHUSETTS**

1. This civil action is brought by the Massachusetts Attorney General pursuant to Massachusetts G.L. c. 12, § 5A *et seq.*, the Massachusetts False Claims Law, arising out of the defendants' performance of pharmacy benefit management services for the Commonwealth.

THE PARTIES

2. The plaintiff, Commonwealth of Massachusetts, is represented by the Attorney General who brings this action in the public interest pursuant to G.L. c. 12, § 5D and G.L. c. 12, § 10. The Attorney General brings this action to enforce Massachusetts False Claims Law and on behalf of the Commonwealth's Group Insurance Commission, which provides health benefits to Massachusetts public employees and retirees.

3. Defendant, Medco Health Solutions, Inc. is a Delaware Limited Liability Corporation

with a principal place of business in New Jersey and with business facilities located in 12 states, formerly including Massachusetts.

4. Medco Health Solutions is the corporate successor to the defendant, Merck-Medco Managed Care, L.L.C. Merck-Medco Managed Care and Medco Health Solutions are collectively referred to herein as "Medco."

5. Medco provides pharmacy benefit management ("PBM") services to persons nationwide. From at least 1994 through July 1, 2000, Medco provided PBM services to the Commonwealth or its political subdivisions, through a contract between Medco and the Massachusetts Group Insurance Commission ("GIC"). Medco provided services to GIC in Massachusetts directly and through its subsidiaries or affiliated companies, including PAID Prescriptions, L.L.C. and Merck-Medco Rx Services of Massachusetts, L.L.C.

## JURISDICTION AND VENUE

6. This court has jurisdiction over the subject matter and defendants of this action pursuant to 31 U.S.C. § 3732(b), 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

7. In accordance with 28 U.S.C. § 1391, venue is proper in the Eastern District of Pennsylvania because the defendant transacts business in this district.

## FACTS

8. The Massachusetts False Claims Law, G.L. c. 12, § 5A-5O, among other things, establishes civil liability for any person who:

- knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval to the Commonwealth (G.L. c. 12, § 5B(1));

- knowingly makes, uses or causes to be made or used, a false record or statement to obtain payment or approval of a claim to the Commonwealth (*Id.* § 5B(2));

- conspires to defraud the commonwealth through the allowance or payment of a false or fraudulent claim (*Id.* § 5B(3));

- enters into an agreement, contract or understanding with one or more officials of the commonwealth knowing the information contained therein is false or fraudulent (*Id.* § 5B(7));

- knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the commonwealth (*Id.* § 5B(8)); or

- is a beneficiary of an inadvertent submission of a false claim to the commonwealth, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth within a reasonable time after the discovery of the false claim (*Id.* § 5B(9)).

9. The Massachusetts False Claims Law provides that any person violating the False Claims Law shall be liable for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, sustained by the Commonwealth because of the person's conduct. The False Claims Law also requires a violator to pay the expenses of this civil action, including, without limitation, attorneys fees, expert's fees, and the costs of investigation. *Id.* § 5B.

10. The Group Insurance Commission (hereafter "GIC") is a political subdivision of the Commonwealth, established by the Massachusetts legislature to provide health insurance and other benefits to employees and retirees of the Commonwealth, their dependents and survivors.

11. The Commonwealth of Massachusetts, through GIC, contracted with the defendant, Medco, to provide services. From 1994 through 1997, GIC contracted with Medco to provide mail order pharmacy services. In late 1996, GIC solicited bid proposals for the provision of PBM services to GIC, to begin July 1, 1997.

12. Medco submitted a PBM bid proposal to GIC in or about January 1997. In or about

March 1997, GIC selected Medco to provide PBM services to GIC. On or about July 1, 1997, Medco entered into an agreement with GIC to provide PBM services to GIC. The agreement between GIC and Medco incorporated by reference the provisions of both GIC's Request for Proposal and Medco's response. That GIC/Medco contract remained in effect until June 30, 2000, when GIC contracted with another PBM to administer a pharmacy benefit to GIC beneficiaries.

13. The 1997 contract between GIC and Medco provided that GIC would participate in Medco's "Preferred Prescription Formulary" and Medco's "formulary management program," which "may include cost containment initiatives, communications with [GIC beneficiaries], Participating Pharmacies and/or physicians, and financial incentives for Participating Pharmacies for their participation." The contract stated that "compliance with Medco's Preferred Prescription Formulary and formulary management program will result in Formulary Rebates," a defined term under the contract, as set forth below.

14. Section 6.2 of the Medco/GIC contract, captioned "Formulary Savings," explained that:

> "[Medco and its affiliates] receive "Formulary Rebates from certain drug manufacturers as a result of the inclusion of such manufacturer's branded products on the Formulary. Medco also conducts therapeutic interchange programs for formulary drugs which will lead to cost savings, measured on an AWP basis ("AWP Savings"). (Formulary Rebates and AWP Savings are jointly referred to as "Formulary Savings.") PAID will provide GIC 100% of the Formulary Savings received by Medco based on the dispensing of each manufacturer's formulary drugs under GIC's program, less a formulary management fee equal to 5% of the greater of such Formulary Savings or Guaranteed Savings."

Medco thus promised that its Preferred Prescriptions Formulary, together with its "formulary management program" would result in "Formulary Savings," 95% of which Medco would pay to GIC.

**Medco Failed to Timely Pay GIC Certain Rebates Under the Contract**

15.     During the term of its contract with GIC, Medco paid money to GIC, by way of invoice credits, attributable to formulary savings. Roughly two quarters (six months) after a calendar quarter, GIC's bi-weekly invoice from Medco reflected the formulary savings for a preceding quarter.  These quarterly credits ranged between $400,000 (third quarter 1997) and $1.4 million (second quarter 2000).

16.     Because of the delay between GIC's accrual of formulary savings in one quarter and Medco's invoice credit to GIC several months later, Medco owed GIC accrued rebates when the contract terminated on June 30, 2000.

17.     On or about February 14, 2001, more than seven months after the GIC contract ended, Medco forwarded to GIC a letter together with a check for more than $2.1 million.  A Medco account manager stated to GIC, in pertinent part:

> Enclosed please find a check in the amount of $2,170,016.98.00(sic) for the first two quarter's rebates in 2000.
>
> This should conclude any further payments to the Group Insurance Commission.

18.     Since the February 14, 2001 correspondence from Medco to GIC, Medco did not advise GIC that additional rebates had been accrued but not yet paid, or that certain manufacturer rebates were delayed in any fashion.  Medco has not paid rebates to GIC since February 14, 2001.

19.     Notwithstanding Medco's February 14, 2001 letter and Medco's subsequent silence, Medco owes, but has failed to pay, additional formulary savings to GIC which accrued during the GIC contract term.  The Commonwealth has reason to believe that Medco owes GIC approximately $784,000 in formulary rebates pursuant to the GIC/Medco contract.

20. Medco failed to advise GIC, in any manner, of the outstanding amount owed GIC. Medco disclosed the accrued but unpaid rebates in December 2003, in response to an investigation by the Commonwealth.

21. By its communications to GIC and its conduct, including but not limited to Medco's February 14, 2001 letter, Medco knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease its obligation to pay or transmit money to GIC. G.L. c. 12, § 5B(8).

### Medco Failed to Pay GIC Certain Rebates that May Have Been "Formulary Rebates" Owed Under the Contract

22. Medco vied for and won the GIC contract based, in large measure, on its claimed ability to save GIC money on prescription drugs. Central to Medco's cost savings initiatives were its Preferred Prescription Formulary ("PPF") and its formulary management programs, which Medco uses to promote the use of certain "preferred" formulary drugs over other "non-preferred" drugs. Indeed, Medco's 1997 bid proposal to GIC, with respect to costs, was premised on GIC's participation in the PPF and Medco's formulary management programs.

23. In its official bid in response to GIC's Request for Proposals, and in its subsequent contract with GIC, Medco emphasized that its formulary and formulary compliance efforts would save GIC money by generating rebates from drug manufacturers.

24. Medco's contract with GIC also stated that its formulary and formulary compliance would generate rebates, and that Medco would provide GIC "100%" of those rebates. Medco described that its formulary compliance programs included drug switching calls and other communications to doctors or beneficiaries, and promised that GIC's compliance with Medco's

formulary management program "will result in Formulary Rebates."

25.     With respect to "Formulary Rebates," as well as "AWP Savings" achieved by soliciting drug switches, Medco promised that 100 percent of those types of "Formulary Savings" would be paid through to GIC, minus a 5% formulary management fee to Medco.  Medco thus promised that its formulary placement decisions and its formulary compliance programs, including drug switching, would save GIC money because: i) those programs would generate "formulary savings," and ii) 95% of formulary savings would be passed through to GIC.

26.     Although Medco's contract with GIC also mentioned that Medco may receive and retain other money from drug manufacturers, both Medco's bid proposal and its contract emphasized that Medco would pass through to GIC "100%" of "Formulary Savings."  On information and belief, at no point during the contracting stage did Medco disclose to GIC or its agents the magnitude of non-"formulary" rebates that Medco might receive from drug manufacturers, and retain for itself.

27.     Contrary to its bid proposal and its contract with GIC, Medco failed to pay to GIC 95% of all "Formulary Savings," that is, money paid by drug manufacturers for formulary placement and formulary compliance measures.  Instead, Medco consistently retained for itself money from drug manufacturers that Medco characterized as something other than "formulary" rebates, even though some of those manufacturer payments may have comprised "formulary savings" as described in the Medco/GIC contract.

28.     During the GIC contract, Medco received roughly $9 million in "formulary" rebates from drug manufacturers attributable to the GIC contract, which Medco passed through to GIC pursuant to the contract.  During the same contract period, on information and belief, Medco received more than $10 million in rebates and other payments from drug manufacturers allocable to

7

the GIC contract, which Medco retained and did not pass through to GIC.

29. Medco thus retained for itself more money from drug manufacturers than it provided to GIC during the contract period. At no point during the contract period did Medco disclose to GIC or its agents the nature and magnitude of Medco-retained payments from drug manufacturers.

30. Medco was able to retain for itself certain drug manufacturer payments that might have been paid to GIC, due to Medco's ability to characterize the payments it received from drug manufacturers. On information and belief, in its dealings with drug manufacturers, Medco itself was able to designate the nature of monies paid to Medco by manufacturers. With respect to Medco's clients like GIC, depending on what Medco calls the manufacturer payments, the money may be treated as "formulary savings" and thus passed through to GIC, or given some other designation, so that the money is not passed through.

31. Because Medco could control how manufacturer payments are characterized, Medco has kept for itself monies that are properly attributable to the formulary or formulary management efforts like drug switching, and accordingly should have been passed through to GIC. By controlling the designation of payments from manufacturers, Medco was able to try to avoid its obligation to pass through payments to its clients. As a result, Medco sometimes failed to satisfy its obligation to pass through to GIC all "Formulary Savings."

32. In light of Medco's actual rebates practice of retaining a significant portion of all manufacturer rebates, Medco used misleading statements to induce GIC to enter into the 1997 contract with Medco, and, on information and belief, entered into the GIC contract knowing that it contained false information. G.L. c. 12, § 5B(9).

33. When Medco reported and credited or paid to GIC its quarterly "formulary savings,"

Medco inaccurately stated or implied that it had paid GIC all rebates and savings due under contract. Medco knowingly made, used or caused to be made or used a false record or statement to conceal, avoid or decrease its obligation to pay GIC all rebates and savings due under the contract. G.L. c. 12, § 5B(8).

## CAUSE OF ACTION

### Count One
(Violation of the Massachusetts False Claim Law, G.L. c. 12, § 5B)

34. The Commonwealth incorporates by reference the allegations of paragraphs 1 through 33 of the Complaint.

35. Medco entered into an agreement, contract or understanding with one or more officials of the Commonwealth, knowing the information contained therein was false or fraudulent, in violation of G.L. c. 12, § 5B(7).

36. Medco knowingly made, used or caused to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Commonwealth, in violation of G.L. c. 12, § 5B(8).

37. Medco knowingly made, used or caused to be made or used, a false record or statement to obtain payment or approval of a claim to the Commonwealth, in violation of G.L. c. 12, § 5B(2).

38. Medco knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the Commonwealth in violation of G.L. c. 12, § 5B(1). Claims by Medco were false or fraudulent because, *inter alia*, the claims were made pursuant to a contract induced by Medco's false or fraudulent representations.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth requests entry of judgment in its favor, and against defendants, in an amount equal to triple the damages sustained by reason of Medco's conduct, together with civil penalties under G.L. c. 12, § 5B, costs of investigation and litigation, including attorneys fees, and such other and further relief as the Court deems equitable and proper.

                                                  Respectfully submitted,

                                                  COMMONWEALTH OF MASSACHUSETTS

                                                  THOMAS F. REILLY
                                                  ATTORNEY GENERAL

Date: April 23, 2004                By:      _____/s/_____
                                                  Christopher Barry-Smith, Mass. BBO # 565698
                                                  Betsy Whittey, Mass. BBO # 645593
                                                  Assistant Attorneys General
                                                  Consumer Protection and Antitrust Division
                                                  Public Protection Bureau
                                                  One Ashburton Place
                                                  Boston, MA 02108
                                                  (617) 727-2200, ext. 2539
                                                  (*Admitted per Local Rule 83.5.2(b)*)

## CERTIFICATE OF SERVICE

The undersigned, Christopher Barry-Smith, hereby certifies that, on **April 23, 2004**, I served, by first class mail, a copy of the Commonwealth's Complaint, on the persons listed immediately below.

          /s/ 
          Christopher K. Barry-Smith
          Assistant Attorney General

## SERVICE LIST

James G. Sheehan, Esquire
Cathy Thomer, Esquire
Sonya Fair Lawrence
Assistant United States Attorneys
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476

Patrick L. Meehan, Esq.
United States Attorney
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476

Marc S. Raspanti, Esquire
MILLER ALFANO & RASPANTI, P.C.
1818 Market Street
Suite 3402
Philadelphia, PA 19103

Michael J. Holston, Esq.
DRINKER BIDDLE & REATH, LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996

Alison M. Duncan, Esquire
PORTER, WRIGHT, MORRIS & ARTHUR
1667 K Street, N.W., Suite 1100
Washington, D.C.  20006

Patrick H. Haggerty, Esq.
Philip E. Kessler. Esq.
PORTER, WRIGHT, MORRIS & ARTHUR
One Dayton Square, Suite 1600
Dayton, Ohio 45402

Benjamin James Stevenson, Esq.
Michael Kelley, Esq.
Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050

William McDaniels, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901

Michael K. Bassham
Peter M. Coughlan
Tennessee Attorney General's Office
Antitrust Division, 3rd Floor
P. O. Box 20207
Nashville, TN 37202

Brian Sandoval, Esq.
Nevada Office of the Attorney General
100 North Carson St.
Carson City, NV 89701-4717

L. Timothy Terry, Esq.
Nevada Office of the Attorney General
Medicaid Fraud Control Unit
198 North Carson St.
Carson City, NV 89701-4717

Gregory C. Fleming, Esq.
Assistant Attorney General
VA Office of the Attorney General
900 East Main St.
Richmond, VA 23219

Arthur J. Parker, Esq.
Charlotte W. Parker, Esq.
Sidney Rocke, Esq.
 D.C. Office of the Inspector General
Medicaid Fraud Control Unit, Ste. 1100
Washington, D.C. 20005

Stuart I. Silverman, Esq.
D.C. Office of the Inspector General
Medicaid Fraud Control Unit, Ste. 1100
Washington, D.C. 20005